# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 4, 2020

Lyle W. Cayce
Clerk

No. 20-50407

TEXAS DEMOCRATIC PARTY; GILBERTO HINOJOSA; JOSEPH DANIEL CASCINO; SHANDA MARIE SANSING; BRENDA LI GARCIA,

Plaintiffs–Appellees,

versus

GREG ABBOTT, Governor of the State of Texas;
RUTH HUGHS, Texas Secretary of State;
KEN PAXTON, Texas Attorney General,

Defendants–Appellants.

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, COSTA, and HO, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

The United States is mired in a pandemic involving a virus that can cause serious illness and sometimes death. Local officials are working tirelessly to "shap[e] their response to changing facts on the ground," knowing that the appropriate response is "subject to reasonable disagreement." *S. Bay*

No. 20-50407

*United Pentecostal Church v. Newsom*, No. 19A1044, 2020 U.S. LEXIS 3041, at \*3 (U.S. May 29, 2020) (mem.) (Roberts, C.J., concurring in the denial of injunctive relief).

"Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *Id.* (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). Either overlooking or disagreeing with that admonition, the district judge *a quo* suspects that—referring to the defendant state officials—"[t]here are some among us who would, if they could, nullify" the promises of the Declaration of Independence and "forfeit[] the vision of America as a shining city upon a hill." He resolves to take matters into his own hands.

In an order that will be remembered more for audacity than legal reasoning, the district judge intervenes just weeks before an election, entering a sweeping preliminary injunction that requires state officials, *inter alia*, to distribute mail-in ballots to any eligible voter who wants one. But because the spread of the Virus[1] has not given "unelected federal jud[ges]"[2] a roving commission to rewrite state election codes, we stay the preliminary injunction pending appeal.

I.

To help ensure the health of Texas voters while protecting the integrity of the state's elections, Governor Greg Abbott declared that, among other things, the May 2020 primary runoff elections would be postponed to July 14,

---

[1] We refer to the relevant virus and the disease it causes as "the Virus."

[2] *S. Bay*, 2020 U.S. LEXIS 3041, at \*3 (Roberts, C.J., concurring) (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985)).

No. 20-50407

2020; that the period for "early voting by personal appearance" would be doubled; and that election officials would issue further guidance to election workers and voters on social distancing and other precautionary measures.[3]

The plaintiffs—the Texas Democratic Party, its chair, and various individual voters—allege that such actions aren't enough. They sued Texas Governor Greg Abbott, Secretary of State Ruth Hughs, and Attorney General Ken Paxton,[4] in state court, seeking injunctive and declaratory relief that, as a matter of Texas law, those eligible to vote by mail include all "eligible voter[s], regardless of age and physical condition . . . if they believe they should practice social distancing in order to hinder the known or unknown spread of a virus or disease." Specifically, the plaintiffs claimed, such voters suffer from a "disability" under Texas election law because a lack of immunity to the Virus constitutes a "physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of . . . injuring the voter's health." TEX. ELEC. CODE § 82.002.

Thus began within the Texas judiciary a saga of sorts. First, the state trial court granted the plaintiffs a preliminary injunction. Texas intervened and filed a notice of interlocutory appeal, which, under Texas law, superseded and stayed the injunction.[5]

Weeks later, General Paxton issued a statement directed at "County Judges and County Election Officials," writing that

[b]ased on the plain language of the relevant statutory text, fear of

---

[3] Governor Abbott also declared a state of disaster for the whole state on March 13, 2020.

[4] Except where relevant to distinguish among the defendants, we refer to them collectively as the "state officials."

[5] *See* TEX. R. APP. P. 29.1(b); *In re State Bd. for Educator Certification*, 452 S.W.3d 802, 805 (Tex. 2014) (Willett, J.).

contracting [the Virus] unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Texas Election Code for purposes of receiving a ballot by mail. Accordingly, public officials shall not advise voters who lack a qualifying sickness or physical condition to vote by mail in response to [the Virus]. . . .

To the extent third parties advise voters to apply for a ballot by mail for reasons not authorized by the Election Code, including fear of contracting [the Virus] without an accompanying qualifying disability, such activity could subject those third parties to criminal sanctions  [citing TEX. ELEC. CODE §§ 84.0041, 276.013].

The plaintiffs successfully moved the Texas Court of Appeals to reinstate the injunction, which the Texas Supreme Court stayed pending its resolution of the state's mandamus petition.

Shortly thereafter, the plaintiffs filed this case against Governor Abbott, General Paxton, Secretary Hughs, the Travis County Clerk, and the Bexar County Elections Administrator.  The plaintiffs claim that Texas's rules for voting by mail (1) discriminate by age in violation of equal protection and the Twenty-Sixth Amendment; (2) restrict political speech under the First Amendment; and (3) are unconstitutionally vague.[6]  The plaintiffs further posit that General Paxton's open letter was a threat constituting voter intimidation, an act in furtherance of a conspiracy to deny the plaintiffs' civil rights.  *See* 42 U.S.C. § 1985.  The plaintiffs seek a declaration to such effect and an injunction preventing the state officials from enforcing Texas's vote-by-mail rules as written.

Quoting the Declaration of Independence, the Gettysburg Address, the Bible, and various poems, the district court, on May 19, 2020, granted the

---

[6] The plaintiffs also claim that the restrictions impermissibly discriminate and abridge voting rights based on race, language, and "disability" status.  In their motion for a preliminary injunction, however, they mentioned those claims only in passing.

plaintiffs a preliminary injunction ordering that "[a]ny eligible Texas voter who seeks to vote by mail in order to avoid transmission of [the Virus]"—which, as the district court itself recognizes, would effectively be *every* Texas voter— "can apply for, receive, and cast an absentee ballot in upcoming elections during the pendency of pandemic circumstances." Further, the court enjoined the state officials from "issuing any guidance, pronouncements, threats of criminal prosecution or orders, or otherwise taking any actions inconsistent with [its] Order."

The district court suggests that, by requiring able-bodied, young voters who are present in the county to visit the polls in person when they may possibly contract the Virus (notwithstanding doubled early voting and other precautionary measures), the state officials wished "to return to the not so halcyon and not so thrilling days of yesteryear of the Divine Right of Kings," "the doctrine that kings have absolute power because they were placed on their thrones by God and therefore rebellion against the monarch [was] always a sin." "One's right to vote should not be elusively based on the whims of nature," the court opined, and therefore "[c]itizens should have the option to" vote by mail. Otherwise, according to the district court, "our democracy and the Republic would be lost and government of the people, by the people and for the people [should] perish from the earth."[7]

In support, the district court held that the plaintiffs are likely to succeed on the merits of all their claims. As for the age-related claims, the court opined that accommodating older voters with the option to vote by mail but requiring younger voters to vote in person "disproportionate[ly] burden[s]" younger

---

[7] We note as an aside that no one in Texas—irrespective of race, age, or disability status—was granted the option to vote by mail until as late as 1933. *See* Act of Jan. 30, 1933, 43rd Leg., R.S., ch. 4, § 1, 1933 TEX. GEN. LAWS 5, 5–6.

voters without any conceivably "rational basis" or "any legitimate or reasonable [state] interest," evincing only that "older voters [are] valued more than [their] fellow citizens of younger age."

Regarding the vagueness claims, the court noted—without waiting (predictably for only a few days) for the Texas Supreme Court to interpret its own state's election law—that "[t]he multiple constructions of [the Texas Election Code] by [General] Paxton and the state court fail to provide people of ordinary intelligence a reasonable opportunity to understand if they are unqualified to access a mail ballot."

Finally, the court concluded that General Paxton's statements publicly disagreeing with the Texas lower courts and accordingly informing election officials likely constituted voter intimidation and an unconstitutional restriction of the plaintiffs' political speech.

Regarding the balance of harms, the district court "conclude[d] that any harm to [the state officials] [wa]s outweighed by the continued injury to Plaintiffs if an injunction d[id] not issue." The injunction did not harm the state officials at all: "No harm occurs when the State permits all registered, legal voters the right to vote by utilizing the existing, safe method that the State already allows for voters over the age of 65." According to the district court, the fact that "[b]etween 2005 [and] 2018"—when, of course, far fewer than literally all Texas voters were eligible to vote by mail—"there were 73 prosecutions out of millions of votes cast" indicates not that voter fraud is difficult to detect and prosecute but instead that "vote by mail fraud is [not] real." And, in any event, because maintaining safety while vindicating constitutional rights is within the public interest, it is, according to the district court, also within the public interest "to prevent [Texas] from violating the requirements of federal law."

No. 20-50407

The state officials filed an emergency motion for a stay pending appeal, and this motions panel granted a temporary administrative stay to consider carefully the motion for stay pending appeal.[8]   In the interim, the Texas Supreme Court, without dissent, largely accepted General Paxton's proffered interpretation of the Texas Election Code.  *In re State*, No. 20-0394, 2020 Tex. LEXIS 452, at *2 (Tex. May 27, 2020) (Hecht, C.J.).[9]   The court held that it "agree[d] with the State that a lack of immunity to [the Virus] is not itself a 'physical condition' that renders a voter eligible to vote by mail within the meaning of [TEX. ELEC. CODE] § 82.002(a)."  *Id.* at *29.

We now stay the preliminary injunction pending appeal.

## II.

"A stay is not a matter of right, even if irreparable injury might otherwise result."  *Nken v. Holder*, 556 U.S. 418, 433 (2009).  Whether to grant a stay is committed to our discretion.  *See Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019).  We evaluate "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken*, 556 U.S. at 426.  "The first two factors are the most critical."  *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (per curiam).  "The proponent of a stay bears the burden of establishing its need."

---

[8] *Hinojosa v. Abbott*, No. 20-50407, 2020 U.S. App. LEXIS 16713 (5th Cir. May 20, 2020) (per curiam).

[9] Also in the interim, we received helpful submissions from the parties and useful briefs of *amici curiae* from the States of Louisiana and Mississippi, jointly; the NAACP Legal Defense and Educational Fund, Inc.; Travis County Clerk Dana DeBeauvoir; Harris County, Texas; a long list of healthcare professionals; and five military veterans.  The court is grateful for the assistance of these distinguished *amici*.

No. 20-50407

*Clinton v. Jones*, 520 U.S. 681, 708 (1997).

## III.

When evaluating the first factor, "[i]t is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434 (quotation marks omitted). Indeed, in the mine run of appeals, "*likelihood* of success remains a prerequisite,"[10] and a "presentation of a substantial case . . . alone is not sufficient."[11] In a limited subset of cases, a "movant need only present a substantial case on the merits" if (1) "a *serious legal question* is involved" and (2) "the balance of the equities weighs *heavily* in favor of granting the stay."[12]

## A.

The state officials claim three jurisdictional bars: (1) The plaintiffs' claims present a nonjusticiable political question; (2) the plaintiffs lack standing; and (3) the claims are barred by sovereign immunity.[13] We address

---

[10] *United States v. Transocean Deepwater Drilling, Inc.*, 537 F. App'x 358, 361 (5th Cir. 2013) (per curiam) (emphasis added and brackets omitted) (quoting *Ruiz v. Estelle*, 666 F.2d 854, 857 (5th Cir. 1982)).

[11] *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 23 (5th Cir. 1992) (per curiam); *see also Weingarten Realty Inv'rs v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011) ("[Movant] argues that a finding that he is likely to succeed on the merits is not necessary if the balance of the equities is strongly in his favor . . . . Our caselaw, however, is to the contrary.").

[12] *Arnold v. Garlock, Inc.*, 278 F.3d 426, 439 (5th Cir. 2001) (emphasis added); *see also Weingarten*, 661 F.3d at 910 ("[T]his court determined that the four-factor test [for a stay] must be fully applied except where there is a serious legal question involved and the balance of equities heavily favors a stay.").

[13] In addition to their jurisdictional points, the state officials maintain that the district court should have abstained under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941). Because the Texas Supreme Court has since ruled in the state officials' favor as to the meaning of "disability" under the Texas Election Code, that issue is moot. Nevertheless, the district court's decision to forge ahead despite an intimately intertwined—and, at that time, unresolved—state-law issue was not well considered.

"For *Pullman* abstention to be appropriate it must involve (1) a federal constitutional challenge to state action and (2) an unclear issue of state law that, if resolved, would make it unnecessary for us to rule on the federal constitutional question." *Moore v. Hosemann*,

each in turn.

### 1.

The state officials—supported by Louisiana and Mississippi as *amici*—assert that this case is a nonjusticiable political question, because the plaintiffs "essentially ask the federal courts to determine whether the State's efforts to combat [the Virus] in the context of elections have been adequate."[14]  In their view, "no manageable standard exists to resolve whether the State has done enough to protect voters from this pandemic."  Relatedly, Louisiana and Mississippi suggest that the district court could not have reached its decision

---

591 F.3d 741, 745 (5th Cir. 2009) (ellipses omitted).  The second factor is flexible—it is satisfied if the constitutional questions will be "substantially modified," *id.*, or otherwise "present[ed] in a different posture," *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980).

The district court's reasons for not abstaining are suspect.  The court stated that "resolution by the State court [would] not [have] render[ed] this case moot nor [have] materially alter[ed] the constitutional questions presented."  But at the time of its ruling, the opposite was true.  The plaintiffs raised federal constitutional challenges to Texas's vote-by-mail scheme, and the Texas Supreme Court's determination as to whether lack of immunity to the Virus equaled a "disability" was bound to alter how the constitutional issues would be presented.

If the plaintiffs had succeeded before the Texas Supreme Court, all Texas voters could have applied to vote by mail under the disability provision.  *See* TEX. ELEC. CODE § 82.002.  Moreover, the plaintiffs' void-for-vagueness, voter-intimidation, and First Amendment claims all turn in substantial part on how the Texas Supreme Court was to interpret that disability provision.  That much should have been obvious, given that the district court itself felt the need to interpret the disability provision.

The district court relied almost exclusively on cases from the Eleventh Circuit.  But whatever that court has held, *we* have stated that "traditional abstention principles apply to civil rights cases," *Romero v. Coldwell*, 455 F.2d 1163, 1167 (5th Cir. 1972) (abstaining in a voting-rights case), including election-law cases involving important and potentially dispositive state-law issues, *see, e.g., Moore*, 591 F.3d at 745–46 (ballot-access case); *United States v. Texas*, 430 F. Supp. 920, 927–31 (S.D. Tex. 1977) (three-judge court).  The district court's ruling turned our jurisprudence on its head.

[14] The plaintiffs suggest that the state officials waived this contention.  Not so.  Questions of justiciability are jurisdictional and non-waivable.  *See Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) ("[T]he concept of justiciability, as embodied in the political question doctrine, expresses the jurisdictional limitations imposed upon federal courts by the case or controversy requirement of Article III." (quotation marks and brackets omitted)).

without first having made an impermissible policy determination. For support, the state officials and their *amici* rely primarily on a recent district court case challenging Georgia's plans for holding upcoming primary elections. *See Coal. for Good Governance v. Raffensperger*, No. 1:20-CV-1677-TCB, 2020 WL 2509092 (N.D. Ga. May 14, 2020).

That contention is unlikely to gain traction. The *Coalition* case is different in kind.[15] That challenge was directed at the specific procedures Georgia planned to use to conduct the election, such as whether to use electronic voting machines or paper ballots. *Id.* at *1. In other words, the suit challenged the *wisdom* of Georgia's policy choices. But to resolve this appeal, we need not—and will not—consider the prudence of Texas's plans for combating the Virus when holding elections. Instead, we must decide only whether the challenged provisions of the Texas Election Code run afoul of the Constitution, not whether they offend the policy preferences of a federal district judge. The standards for resolving such claims are familiar and manageable, and federal courts routinely entertain suits to vindicate voting rights.[16]

## 2.

The state officials contend that they are likely to show that the plaintiffs lack standing.[17] "To establish standing under Article III of the Constitution, a

---

[15] The other cases on which the state officials and their *amici* rely—most notably, *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), which involved partisan gerrymandering, and *Jacobson v. Florida Secretary of State*, 957 F.3d 1193, 1212–23 (11th Cir. 2020) (W. Pryor, J., concurring), which involved the allocation of the top position on the state's paper ballots—are also of no help.

[16] *See, e.g., Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (considering constitutional challenge to Texas's voter-identification law).

[17] The state officials raise a standing problem only as to the plaintiffs' challenges to Texas's vote-by-mail provisions, for which Governor Abbott and Secretary Hughs could be potential enforcers. The state officials do not contend that the plaintiffs lack standing to press their voter intimidation or First Amendment claims against General Paxton.

plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, No. 17-1712, 2020 WL 2814294, at *2 (U.S. June 1, 2020). The state officials assert that the plaintiffs cannot satisfy the last two prongs, because "[a]cceptance or rejection of an application to vote by mail falls to local, rather than state, officials."

Our precedent, however, poses a significant obstacle. In *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612–13 (5th Cir. 2017), we considered a challenge to Texas Election Code section 61.033, which requires an interpreter to "be a registered voter of the county in which the voter needing the interpreter resides." Texas averred that the second and third standing factors were not satisfied, because the plaintiff's injury was caused by local election officials—who determined whether a voter could serve as an interpreter—not the state or its Secretary of State. *Id.* at 613. The panel rejected that position, holding that the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State, who serves as the 'chief election officer of the state.'" *Id.* (quoting TEX. ELEC. CODE § 31.001(a)).

So too here. Texas's vote-by-mail statutes are administered, at least in in the first instance, by local election officials.[18] But the Secretary of State has the duty to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by "prepar[ing] detailed and comprehensive written directives and instructions relating to" those vote-by-mail rules. TEX. ELEC. CODE § 31.003. And the Secretary of State has the

---

[18] *See* TEX. ELEC. CODE § 83.005 ("The city secretary is the early voting clerk for an election ordered by an authority of a city."); *id.* § 86.001(a) ("The early voting clerk shall review each application for a ballot to be voted by mail.").

No. 20-50407

power to "take appropriate action to protect" Texans' voting rights "from abuse by the authorities administering the state's electoral processes."[19]   Based on that, the state officials have not shown—at least as to the Secretary of State— that they are likely to establish that the plaintiffs lack standing.

That analysis applies with far less force, however, to Governor Abbott. *OCA-Greater Houston*, 867 F.3d at 613, was a suit against *only* the state of Texas and its Secretary of State.  The Texas Election Code delegates enforcement power for the vote-by-mail provisions to "early voting clerk[s]," subject to control by the Secretary of State.   *See* TEX. ELEC. CODE § 86.001(a).  Those rules provide no role for the Governor.

The plaintiffs disagree, pointing to several of the Governor's actions that they believe demonstrate his "extensive enforcement with respect to state elections."[20]  But those actions—all of which addressed *when* an election was to be held, not *how* it was to be conducted—were exercises of the Governor's *emergency powers*, not any authority given him by the Texas Election Code. Because the plaintiffs have pointed to nothing that outlines a relevant enforcement role for Governor Abbott, the plaintiffs' injuries likely cannot be fairly traced to him.  *See Thole*, 2020 WL 2814294, at \*2.

3.

The state officials aver that they are "likely to show that the preliminary injunction is barred by sovereign immunity."

---

[19] *Id*. § 31.005(a).  That includes the power to issue orders and, if necessary, seek a temporary restraining order, injunction, or writ of mandamus.  *Id*. § 31.005(b).

[20] Those actions include Governor Abbott's (1) changing the date of the special election for State Senate District 14, (2) allowing political subdivisions to postpone elections originally scheduled for May 2, 2020, to November 3, 2020, and (3) postponing the May 26, 2020, primary runoff to July 14, 2020.

No. 20-50407

a.

Generally, state sovereign immunity precludes suits against state officials in their official capacities. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). The important case of *Ex parte Young*, 209 U.S. 123 (1908), is an exception to that baseline rule, but it permits only "suits for prospective . . . relief against state officials acting in violation of *federal* law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (emphasis added). It does not sanction suits targeted at *state*-law violations. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124–25 (1984).

To be sued, state officials must "have 'some connection' to the state law's enforcement," *Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507, 517 (5th Cir. 2017), which ensures that "the suit is [not] effectively against the state itself," *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020). The precise scope of the "some connection" requirement is still unsettled,[21] but the requirement traces its lineage to *Young* itself.[22]   We do know, though, that it is not enough that the official have a "*general* duty to see that the laws of the state are implemented." *Morris*, 739 F.3d at 746 (emphasis added). And "[i]f the official sued is not statutorily tasked with enforcing the challenged law, then the requisite

---

[21] Our decisions are not a model of clarity on what "constitutes a sufficient connection to enforcement." *Austin*, 943 F.3d at 999 (quotation marks and alteration omitted). In *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (en banc) (quotation marks omitted), a plurality recognized that *Young* mandates that the state officials "have some connection with the enforcement of the act in question or be specially charged with the duty to enforce the statute and be threatening to exercise that duty." But a later panel declined to follow that "specially charged" requirement, specifically because it determined that *Okpalobi* was not binding precedent. *See K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). A separate panel quoted a different part of *Okpalobi* as setting forth the proper standard. *See Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014).

[22] *See Young*, 209 U.S. at 157 ("[I]t is plain that [a state] officer must have *some connection* with the enforcement of the [relevant state law], or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party." (emphasis added)).

13

connection is absent and our *Young* analysis ends." *Abbott*, 956 F.3d at 709 (quotation marks omitted).

Moreover, a mere connection to a law's enforcement is not sufficient— the state officials must have taken some step to enforce. But how big a step? Again, the line evades precision. One panel observed that "'[e]nforcement' typically involves compulsion or constraint." *K.P.*, 627 F.3d at 124. Another defined it as "a demonstrated willingness to exercise" one's enforcement duty. *Morris*, 739 F.3d at 746. But the bare minimum appears to be "some scintilla" of affirmative action by the state official. *Austin*, 943 F.3d at 1002.

Finally, there is "significant overlap" between our standing and *Young* analyses. *Air Evac*, 851 F.3d at 520. "[I]t may be the case that an official's connection to enforcement is satisfied when standing has been established," because if an "official *can* act, and there's a significant possibility that he or she *will* . . . , the official has engaged in enough compulsion or constraint to apply the *Young* exception." *Austin*, 943 F.3d at 1002 (emphasis added) (quotation marks and alteration omitted).

b.

The state officials assert that, for three reasons, *Young* is not satisfied: (1) The district court lacked jurisdiction to order the state officials to comply with state law; (2) because none of the state officials "enforces the mail-in ballot rules," they lack the "requisite connection" to be sued; and (3) General Paxton's statements do not constitute threats of enforcement sufficient to invoke *Young*. None of those notions is likely to carry the day.

The pleadings belie the state officials' first contention. The complaint seeks to prevent the enforcement of provisions of the Texas Election Code that the plaintiffs believe violate the Constitution. The plaintiffs are not hoping to

secure a "consistent application of state law"; to the contrary, their case before the *state* courts focused solely on state-law issues.

The second contention also runs into a significant roadblock. As we recognized above, our precedent suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to support standing. *See OCA-Greater Hous.*, 867 F.3d at 613. That, in turn, suggests that *Young* is satisfied as to the Secretary of State. *See Austin*, 943 F.3d at 1002. But, as discussed above, because the Governor "is not statutorily tasked with enforcing the challenged law[s], . . . our *Young* analysis," at least as to him, "ends." *Abbott*, 956 F.3d at 709 (quotation marks omitted).

Finally, though the state officials' third contention raises a close question, they have not shown that they are likely to succeed. They acknowledge that General Paxton "has concurrent jurisdiction with local prosecutors to prosecute election fraud." And a state attorney general's sending letters threatening enforcement is enough to satisfy *Young*.[23] Such action goes beyond merely making a public statement that a law will be enforced.[24] Though the state officials maintain that General Paxton's letters did not constitute enforcement threats, *NiGen* prevents the officials from making the necessary "strong showing" that their position is *likely* to be vindicated. *Nken*, 556 U.S. at 426.

---

[23] *See NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 393–95 (5th Cir. 2015). We have recognized that *NiGen* "did not explicitly examine [General] Paxton's 'connection to the enforcement' of the [state statute]." *Austin*, 943 F.3d at 1001. Nevertheless, "the fact that Paxton sent letters threatening enforcement of the [state statute] makes it clear that he had not only the authority to enforce [it], but was also constraining the [plaintiff's] activities, in that it faced possible prosecution." *Id.*

[24] *See Abbott*, 956 F.3d at 709 ("[O]ur cases do not support the proposition that an official's public statement alone establishes authority to enforce a law, or the likelihood of his doing so, for *Young* purposes.").

No. 20-50407

B.

We turn to the constitutional claims. Texas Election Code § 82.003 generously provides those aged sixty-five and older with the option to vote by mail, but the district court held that that provision violates equal protection as applied. The state officials will likely show that it does not.

1.

"States . . . have broad powers to determine the conditions under which the right of suffrage may be exercised," *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959), and Texas has long allowed certain groups, including persons aged sixty-five and over, to vote early by mail.[25]

Not everyone has that privilege, however, so with the Virus spreading, Texas plans to implement measures to protect those who go to the polls. Those measures include the bread and butter of social distancing, such as protective masks for election workers, plentiful cleaning wipes and hand sanitizer, cotton swabs for contacting touch screens, and floor decals inside the polling places that show where voters should stand.[26]

The plaintiffs demand that Texas go further. They complain that the state violates the Equal Protection Clause of the Fourteenth Amendment in failing to extend the vote-by-mail privilege to them.

The plaintiffs' theory comes in two flavors. First, they assert (rightly) that section 82.003 facially discriminates on the basis of age, and they conclude

---

[25] *See* TEX. ELEC. CODE §§ 82.001–82.004, 82.007; *In re State*, 2020 Tex. LEXIS 452, at *21 (noting that Texas first permitted early voting in 1917 and a mail ballot in 1933). An absentee ballot for those sixty-five and older was first allowed in 1975. *Id.* at *22.

[26] *Id.* at *26 ("[A]s [Texas] highlights, authorities planning elections are working in earnest to ensure adherence to social distancing, limits on the number of people in one place, and constant sanitation of facilities.").

(wrongly) that strict scrutiny applies. Second, they stress that because the statute doesn't permit them to vote by mail during this pandemic, it unlawfully burdens their fundamental right to exercise the franchise.

The district court had no trouble agreeing with the plaintiffs, hurling invectives at what it apparently saw as the state officials' harebrained justifications for gifting older but not younger voters with a vote by mail. The district judge concluded that strict scrutiny applies, because section 82.003 supposedly places a severe burden on the plaintiffs' right to vote, as voters who trek to the polls risk exposure to the Virus.

In so doing, the court rejected Texas's asserted interests in giving older citizens special protection and in guarding against election fraud. "Both reasons, even taken at face-value [*sic*], fail to outweigh the burden voters will face in exercising their right to vote before the threat of [the Virus] can be realistically be [*sic*] contained."

The district court opined, in the alternative, that the statute would fail even rational-basis review—a standard under which a law enjoys "a strong presumption of validity." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). "There is no rational state interest," the district court informed the state officials, "in forcing the majority of . . . voters to visit polls in-person [*sic*] during a novel global pandemic, thus jeopardizing their health (and the health of all those they subsequently interact with)." Neither is there a valid "interest in fencing out voters under the age of 65 [on a theory that] it would introduce rampant fraud, while allowing older voters to utilize mail ballots and allowing the alleged rampant fraud therewith." No stranger to rank speculation, the judge then accused Texas of seeking to disenfranchise a certain "sector of the

No. 20-50407

population because of the way they [*sic*] may vote."[27]

2.

The state officials will likely prove error, because the district court ignored the case that squarely governs the equal-protection issue: *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 803 (1969) (Warren, C.J.).[28]    Under *McDonald*, rational-basis review will probably apply, and section 82.003 stands.

a.

In *McDonald*, the Court held that an Illinois statute that denied certain inmates mail-in ballots did not restrict their right to vote. *Id.* at 807. Instead, it burdened only their asserted right to an absentee ballot, because there was no evidence that the state would not provide them another way to vote. *Id.* at 807–08. Put differently, there was no indication that the inmates were "in fact *absolutely prohibited* from voting by the State[.]" *Id.* at 808 n.7 (emphasis added). The absentee rules did "not themselves deny [the inmates] the exercise of the franchise; nor, indeed, d[id] Illinois' Election Code so operate as a whole[.]" *Id.* at 807–08.

The *McDonald* Court therefore applied rational-basis review, not strict scrutiny, and easily upheld the absentee-ballot scheme. *Id.* at 808–11. The state's refusal to give the inmates a mail ballot was not irrational, "particularly in view of the many other classes of Illinois citizens not covered by the absentee provisions, for whom voting may [have been] extremely difficult, if not practically impossible." *Id.* at 809–10.

---

[27] This is an extremely serious accusation that calls into question the judge's even-handedness.  In the interest of time and space, we let it pass without further comment.

[28] Amazingly, the district court cites *McDonald* but once—and only to summarize Texas's arguments.

18

No. 20-50407

b.

The state officials will likely succeed in showing that *McDonald* controls. Texas has similarly decided to give only some of its citizens the option to vote by mail.[29]  That statutory scheme, which is "designed to make voting more available to some groups who cannot easily get to the polls," does not itself "deny" the plaintiffs "the exercise of the franchise."  *Id.* at 807–08.  The plaintiffs are welcome and permitted to vote, and there is no indication that they "are in fact absolutely prohibited from voting *by the State.*"  *Id.* at 808 n.7 (emphasis added).  So the right to vote is not "at stake," *id.* at 807, and rational-basis review follows, *id.* at 807–11.

In the hopes of securing heightened scrutiny, the plaintiffs take a swing at distinguishing *McDonald.*  They assert that here, unlike in *McDonald*, there is evidence that section 82.003 affects their ability to vote, given the risks of venturing outside the home to vote in person.  Relatedly, they theorize that unlike the statute in *McDonald*, the Texas statute, TEX. ELEC. CODE § 82.003, distinguishes among voters on the basis of a supposedly unlawful basis (age). The plaintiffs also suggest that *McDonald* is out of tune with more recent voting-rights jurisprudence.

The state officials will likely succeed in rebutting those contentions.  It is true that "the Court's disposition of the claims in *McDonald* rested on a failure of proof," *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974), but that cuts against the plaintiffs, not for them.  The very same "failure[s] of proof" exist here, because, as explained, there is no evidence that Texas has prevented the plaintiffs from voting by all other means.  *Id.*

---

[29] *See* TEX. ELEC. CODE §§ 82.001–82.004, 82.007; *see also In re State*, 2020 Tex. LEXIS 452, at *21 ("The history of absentee voting legislation in Texas shows that the Legislature has been both engaged and cautious in allowing voting by mail.").

The Virus, to be sure, increases the risks of interacting in public. But, under *McDonald*, a state's refusal to provide a mail-in ballot does not violate equal protection unless—again—the state has "in fact absolutely prohibited"[30] the plaintiff from voting.[31] Texas permits the plaintiffs to vote in person; that is the exact opposite of "absolutely prohibit[ing]" them from doing so.[32]

"Ironically, it is [Texas's] willingness" to afford flexibility to older citizens "that has provided [the plaintiffs] with a basis for arguing that the provision[]" discriminates. *McDonald*, 394 U.S. at 810–11. The Constitution is not "offended simply because some" groups "find voting more convenient than" do the plaintiffs because of a state's mail-in ballot rules. *Id.* at 810. That is true even where voting in person "may be extremely difficult, if not practically impossible," because of circumstances beyond the state's control, such as the

---

[30] *McDonald*, 394 U.S. at 808 n.7; *see also id.* at 809. In another place, the *McDonald* Court states the rule, a bit differently, as whether the "statutory scheme has an impact on [the plaintiffs'] ability . . . to vote." *Id.* at 807. But the Court spoke twice of an "absolute[] prohibit[ion]," and *McDonald*'s follow-on cases quote and apply that language. *See O'Brien*, 414 U.S. at 529–30; *Goosby v. Osser*, 409 U.S. 512, 521 & 521 n.7 (1973). *McDonald*, 394 U.S. at 808, also referred to whether the state had "in fact precluded" the vote. In any event, in this context, there is no relevant difference between the various formulations, because Texas's decision to allow those aged sixty-five and older to vote by mail does not "impact" the plaintiffs' ability to vote.

[31] *See Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 733 (Minn. 2003) ("In *McDonald*, the Court concluded that an Illinois statute that denied unconvicted jail inmates absentee ballots did not restrict the inmates' right to vote . . . because there was no evidence that jail officials would not provide another means . . . to vote.").

[32] The plaintiffs urge that, in *Veasey*, 830 F.3d at 216, we—in the plaintiffs' words— "rejected Texas's argument that the provision of one form of voting justifies deprivation of another form of voting, here, mail-in voting." But *Veasey* stated only that Texas's provision of a mail-in ballot did not make up for the burdens that its voter-identification law placed on voting in person. *See id.* at 255 ("The district court did not clearly err in finding that mail-in voting is not an acceptable substitute for in-person voting in the circumstances presented by this case."). *Veasey* nowhere said that the state must provide everyone multiple ways to vote. And here, unlike in *Veasey*, the *state* has not placed any obstacles on the plaintiffs' ability to vote in person. That distinction is precisely the one that *McDonald*, 394 U.S. at 807, 808 n.7, 809, relied on in concluding that rational-basis review was appropriate. *Veasey* is inapposite.

presence of the Virus.[33]

*McDonald*'s progeny drives the point home.  In *Goosby*, 409 U.S. at 521, the Court distinguished *McDonald* on the ground that "the Pennsylvania statutory scheme absolutely prohibit[ed the plaintiffs] from voting."  Similarly, in *O'Brien*, 414 U.S. at 530, the plaintiffs were "denied any alternative means of casting their vote," so *McDonald* did not control.  Thus, in both *Goosby* and *O'Brien*, the absentee rules were suspect only because the state had prevented the vote.[34]  The mail-in ballot, in other words, was the plaintiffs' only shot at exercising the franchise.  The same is not true here.

The plaintiffs fare no better in trying to distinguish *McDonald* by pointing out that section 82.003 discriminates based on age.  True, in *McDonald*, 394 U.S. at 807, rational-basis scrutiny applied partly because the statute did not discriminate on the basis of race or wealth.  But section 82.003 also does not differentiate on impermissible equal-protection grounds, given that age is not a suspect class.[35]

Though they complain of age discrimination, the plaintiffs next assail

---

[33] *McDonald*, 394 U.S. at 810.  The Court gave examples of persons who, for reasons beyond the state's control, might not be able to make it to the polls on election day, such as a doctor called in for emergency work.  *See id.* at 810 n.8.  The court implied that a state's failure to provide such persons with an absentee ballot is not irrational.  *Id.* at 809–10 ("Illinois could . . . make voting easier . . . by extending absentee voting privileges to those in [the inmates'] class.  Its failure to do so, however, hardly seems arbitrary, particularly in view of the many other classes of Illinois citizens not covered by the absentee provisions, for whom voting may be extremely difficult, if not practically impossible.").

[34] *See also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) (distinguishing *McDonald* on the ground that "[t]he present appeal involves an absolute denial of the franchise").

[35] *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000).  Of course, the Twenty-Sixth Amendment is relevant to age discrimination in voting; the plaintiffs' claim under it is covered below.

*McDonald* for being too aged.[36]   Decided in 1969, *McDonald* supposedly "predates most of the Supreme Court's modern voting rights jurisprudence." At bottom, the plaintiffs think that *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), have put *McDonald* in the grave.

Yet the Supreme Court abrogates its cases with a bang, not a whimper, and it has never revisited *McDonald*.[37]  Because *McDonald* "has direct application in [this] case, . . . the Court of Appeals should follow" it, "leaving to [the High] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

Regardless, the Court has not discarded *McDonald*, *sub silentio* or otherwise.  By the time *McDonald* was handed down, the basic doctrinal framework was in place, and *McDonald* has not become an albatross since.  Indeed, "[b]y 1969, . . . the Supreme Court had been stating that voting was a fundamental right stretching back more than eight decades.  The Warren Court itself had repeatedly employed strict scrutiny to examine infringements on the franchise."[38]  *Anderson*, for its part, does not cite (much less overrule) *McDonald*, and *Burdick* cites it favorably.[39]  *McDonald* lives.

---

[36] We resist the flippant observation that solicitude for old precedent is like accommodation to older voters.

[37] *See, e.g.*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."); *see also League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311, 317 (5th Cir. 2020) (referencing and applying that principle).

[38] Justin Driver, *The Constitutional Conservatism of the Warren Court*, 100 CALIF. L. REV. 1101, 1154 (2012) (footnote omitted); *see Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (noting that the right to vote is "a fundamental political right, because [it is] preservative of all rights").

[39] *See generally Anderson*, 460 U.S. 780 (not mentioning *McDonald*); *see also Burdick*, 504 U.S. at 434 (citing *McDonald* with approval).

No. 20-50407

c.

Because the plaintiffs' fundamental right is not at issue, *McDonald* directs us to review only for a rational basis, under which "statutory classifications will be set aside only if no grounds can be conceived to justify them."[40] The law need only "bear some rational relationship to a legitimate state end." *McDonald*, 394 U.S. at 809.

The state officials are likely to show that section 82.003's age distinction survives. As the state notes, "[e]ven outside the context of [the Virus], individuals aged 65 and over . . . face unique challenges in attending the polls," so "[t]he State's decision to allow older Texans to vote by mail without extending that ability to everyone is a rational way to facilitate exercise of the franchise for Texans who are more likely to face everyday barriers to movement."

We agree. Texas has a proper interest in helping older citizens to vote, and its decision to permit them to do so by mail is a rational way to satisfy that "laudable state policy." *McDonald*, 394 U.S. at 811. If anything, the Virus's existence proves the reasonableness of Texas's approach, given that older persons have a greater risk of becoming seriously ill or dying from it, as the record demonstrates.[41]

The district court held (in the alternative) that section 82.003 has no rational basis. But it is the court's analysis that is short on rationality. There is not a single principle of rational-basis review that the district court got right.

---

[40] *McDonald*, 394 U.S. at 809; *see also Beach Commc'ns, Inc.*, 508 U.S. at 315 ("[T]hose attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it[.]" (quotation marks omitted)).

[41] *See also In re State*, 2020 Tex. LEXIS 452, at *3 ("Indications are that people who are over 65 years old or that have pre-existing medical conditions are at a higher risk of being very sick from the disease." (citing *Coronavirus Disease 2019 (COVID-19)*, TEX. DEP'T OF STATE HEALTH SERVS., https://www.dshs.texas.gov/coronavirus/, *available at* https://perma.cc/95N8-CUYR (captured May 28, 2020))).

No. 20-50407

Take one example. Even though a court must uphold the law if there is any conceivable basis for it, *see, e.g.*, *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1782 (2019) (per curiam), the district court instead tried to divine Texas's true intent. Shooting in the dark, the court guessed that Texas wanted to "forc[e] . . . voters to visit polls in-person [*sic*] during a novel global pandemic, thus jeopardizing their health" and to "fenc[e] out from the franchise a sector of the population because of the way they [*sic*] may vote." This kind of drive-by speculation about the state's covert motives is utterly impermissible and finds no support in this record.[42] Instead of searching for a conceivable basis for the rules, the court jerry-rigged some straw men and proceeded to burn them.

The district court also forgot that the legislature can "take one step at a time, addressing itself to the phase of the problem which seems most acute," *Beach Commc'ns*, 508 U.S. at 316, without worrying that a rogue district judge might later accuse it of drawing lines unwisely.[43] Undeterred, the court reasoned that it is absurd for Texas to "fenc[e] out voters under the age of 65" from a mail-in ballot because of frets about fraud "while allowing older voters to u[se] mail ballots," thereby risking the same "rampant fraud."

The district judge should know that that is not how rational-basis review

---

[42] *See Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992) (holding that the legislature need not "actually articulate at any time the purpose or rationale supporting its classification"); *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("It is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision[.]" (quotation marks omitted)). And as observed, *supra*, it is a grave and malicious accusation for a district judge to make.

[43] *See Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012) ("[T]he Constitution does not require the [state] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line."); *Fritz*, 449 U.S. at 179 ("Where, as here, there are plausible reasons for [the legislature's] action, our inquiry is at an end. . . . This is particularly true where the legislature must necessarily engage in a process of line-drawing."); *McDonald*, 394 U.S. at 809.

works. *See McDonald*, 394 U.S. at 809. Texas may take one bite at the apple; it need not swallow it whole. *See, e.g.*, *Fritz*, 449 U.S. at 179. That "the line might have been drawn differently . . . is a matter for legislative, rather than judicial, consideration." *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 108 (2003).

The policy merits of Texas's voting procedures were not before the district court, even though the Virus has raised the stakes. "[R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319 (1993) (quotation marks omitted). Instead, the Constitution gives the states authority over "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," U.S. CONST. art. I, § 4, cl. 1, "which power is matched by state control over the election process for state offices," *Clingman v. Beaver*, 544 U.S. 581, 586 (2005). "[T]he right to vote in any manner" is therefore not "absolute," *Burdick*, 504 U.S. at 433, because "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections[.]"[44]

It was not for the district judge to disparage Texas's response to the Virus and constitutionalize his favored version of the Election Code. *See, e.g.*, *Heller*, 509 U.S. at 319. The state officials will therefore likely demonstrate error.

## C.

The well-respected logic of *McDonald* applies equally to the Twenty-Sixth Amendment claim, so the state officials are likely to show that the

---

[44] *Burdick*, 504 U.S. at 433; *see also* Michael E. Waterstone, Lane, *Fundamental Rights, and Voting*, 56 ALA. L. REV. 793, 836 (2005) ("[T]he [Supreme] Court has been reluctant to apply strict scrutiny in challenges to restrictions on the franchise that the Court views as impacting only the administration of elections—in particular, when a challenge is of a particular voting procedure." (quotation marks omitted)).

No. 20-50407

district court erred in finding for the plaintiffs.

The Twenty-Sixth Amendment is not a major player in federal litigation.[45] Ratified in 1971, it states that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. CONST. amend. XXVI, § 1. It also gives Congress enforcement power. *See id.* § 2. Consistent with its plain language, there is plenty of evidence that the Amendment's most immediate purpose was to lower the voting age from twenty-one to eighteen.[46]

The district court seemed to agree with the plaintiffs' notion that the summary affirmance in *Symm v. United States*, 439 U.S. 1105 (1979) (mem.), proves that strict scrutiny governs Twenty-Sixth Amendment claims. But that

---

[45] *See, e.g.*, Eric S. Fish, Note, *The Twenty-Sixth Amendment Enforcement Power*, 121 YALE L.J. 1168, 1170 (2012) ("[T]he Twenty-Sixth Amendment has received scant attention. It has been applied in only one Supreme Court case and a handful of state and lower federal court cases." (footnote omitted)).

[46] *See, e.g.*, Fish, *supra*, at 1184–95 (reviewing the history underlying the passage and speedy ratification of the Twenty-Sixth Amendment); Yael Bromberg, *Youth Voting Rights and the Unfulfilled Promise of the Twenty-Sixth Amendment*, 21 U. PA. J. CONST. L. 1105, 1131 (2019) ("With the 1972 presidential elections looming, Congress returned to the effort to expand the franchise to youth in state and local elections via constitutional amendment. A sense of urgency arose . . . based on the inherent unfairness that would result in allowing young people to vote in federal races but not state or local races[.]").

We do not necessarily imply that the Twenty-Sixth Amendment is toothless to do anything beyond lowering the voting age. Some say that its plain language sweeps more broadly—and some say the opposite. *Compare* Fish, *supra*, at 1176 (analyzing the Twenty-Sixth Amendment's text and contending that it did more than "exclusively lower[] the voting age"), *with* 1 BRUCE ACKERMAN, WE THE PEOPLE: FOUNDATIONS 91 (1991) ("The speed of [the Twenty-Sixth Amendment's passage] was a tribute to its proponents' success in explaining that they had a very narrow object: the problem was simply to guarantee eighteen-year-olds the vote that Congress had sought to assure by [a statute held unconstitutional in *Oregon v. Mitchell*, 400 U.S. 112 (1970)]. . . . All [the Amendment] did was change the voting age from twenty-one to eighteen. Nobody looked upon it as something more."). Because *McDonald*'s logic effectively controls the Twenty-Sixth Amendment claim, we need not dive into this historical debate.

26

reads *Symm*'s four words—"[t]he judgment is affirmed"—to stand for too much. "A summary disposition affirms only the judgment of the court below, and no more may be read into [it] than was essential to sustain that judgment." *Anderson*, 460 U.S. at 784 n.5. The affirmance prevents us "from coming to opposite conclusions" only "on the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam).

The only precise issue in *Symm* (as relevant here) was whether it violates the Twenty-Sixth Amendment to mandate that a student meet heightened residency requirements as a condition for being registered to vote. *See United States v. Texas* ("*Symm*"), 445 F. Supp. 1245, 1251 (S.D. Tex. 1978) (three-judge court), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (mem.). The *Symm* district court[47] held that it so violated. *Id.* at 1261. But the court nowhere stated that strict scrutiny applies anytime a voting-procedure rule—no matter the context—makes an age distinction. Even if it had, such a broad decree would not have been essential to the judgment. *See Anderson*, 460 U.S. at 784 n.5. The state officials will therefore likely succeed in showing that *Symm* does not require strict scrutiny for the Twenty-Sixth Amendment claim.

Instead, employing *McDonald*'s logic leads inescapably to the conclusion that rational-basis review applies. If a state's decision to give mail-in ballots only to some voters does not normally implicate an equal-protection right to vote, *see McDonald*, 394 U.S. at 807–08, then neither does it implicate "[t]he right . . . to vote" of the Twenty-Sixth Amendment. There is no reason to treat the latter differently. Indeed, *McDonald*'s logic applies neatly to the Twenty-Sixth Amendment's text—which was ratified two years after *McDonald*—because the Amendment similarly focuses on whether the *state* has "denied or

---

[47] The Supreme Court heard *Symm* on direct appeal from the district court.

abridged" the right to vote.

As above, there is no evidence that *Texas* has denied or abridged that right; properly qualified voters may exercise the franchise. So what "is at stake here" is "not the right to vote . . . but a claimed right to receive absentee ballots." *McDonald*, 394 U.S. at 807. Rational basis therefore likely applies, *see id.* at 807–08, and, for reasons now familiar, the Texas Election Code's vote-by-mail rules live to see another day, *see* TEX. ELEC. CODE § 82.003.

The Virus's emergence has not suddenly obligated Texas to do what the Constitution has never been interpreted to command, which is to give everyone the right to vote by mail. So as to the equal protection and Twenty-Sixth Amendment claims, the state officials are substantially likely to prove error.

### D.

The district court concluded that the plaintiffs are likely to succeed on their void-for-vagueness claim. The state officials, in turn, are likely to show the opposite.

"A statute is unconstitutionally vague if it does not give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited[.]'" *United States v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "The void-for-vagueness doctrine has been primarily employed to strike down criminal laws." *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000). "In the civil context, the statute must be so vague and indefinite as really to be no rule at all." *Id.* (quotation marks omitted).

That is not so here, nor do the plaintiffs allege that it is. Texas law provides an adequate definition of "disability": "a sickness or physical condition that prevents the voter from appearing at the polling place on election day

28

without a likelihood of needing personal assistance or of injuring the voter's health." TEX. ELEC. CODE § 82.002(a). That provision—which was at issue in the related state-court litigation—is hardly so unclear as not to establish a rule at all. Even under a more stringent standard, the Texas definition is specific enough to provide notice.

E.

The state officials are likely to show that the voter-intimidation claim is meritless. The plaintiffs asserted that claim under 42 U.S.C. § 1985(3), which prohibits, *inter alia*, conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." "To state a claim under . . . § 1985(3), a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States." *Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994).

For several reasons, the state officials will likely succeed. To start, there is no conspiracy involving two or more persons. "It is a long-standing rule in this circuit that a 'corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'" *Id.* at 653 (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)). In the plaintiffs' motion for preliminary injunction, they complained that "General Paxton has worked in concert with employees . . . in issuing his threats." Paxton cannot conspire with his employees for purposes of § 1985(3).

Additionally, the state officials will likely show that General Paxton did not deprive anyone of the equal protection of the laws. To the contrary, the

No. 20-50407

plaintiffs seek to prohibit General Paxton from communicating truthfully about Texas law.  And by characterizing his comments as "threats," the district judge undermined freedom of speech, rule of law, and the power of public officials to participate in public discourse.

F.

The state officials likely will show that General Paxton did not threaten the free-speech rights of these plaintiffs or anyone else.  Under Texas law, it is a crime for voters to submit knowingly false applications to vote by mail or for third parties to encourage voters to do so.  *See* TEX. ELEC. CODE §§ 84.0041, 276.013.  Because the Texas Supreme Court interpreted "disability" not to include lack of immunity to the Virus, *In re State*, 2020 Tex. LEXIS 452, at *2, it is a crime to encourage voters to indicate that they are disabled merely because they lack immunity.

We need not decide today whether the First Amendment allows for prosecutions based on encouraging others to submit knowingly false applications to vote by mail.  No one has been charged with a crime, and the plaintiffs do not seek relief—declaratory or otherwise—asserting a right against such prosecutions.[48]  But what the plaintiffs *do* contend is that General Paxton violated their First Amendment rights solely by expressing his professional interpretation of the law—an interpretation that now has been vindicated by the state's highest civil court.  To the extent that General Paxton's comments

[48] The plaintiffs' proffered theory is not that they have been denied a First Amendment right to encourage illegal activity.  Instead, they suggest that it is perfectly legal under Texas law to apply to vote by mail by citing a "disability" based only on a fear of contracting the Virus.  The Texas Supreme Court has ruled otherwise.  *See In re State*, 2020 Tex. LEXIS 452, at *2.  Again, had the district court chosen to abstain, the issue would certainly have been "present[ed] in a different posture"—if at all.  *Palmer*, 617 F.2d at 428.  But the court did not abstain, and we decline to consider arguments that are not before this court and were not presented to the district court.

No. 20-50407

represent governmental speech, they are "not barred by the Free Speech Clause." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

The plaintiffs are not *sui generis* in their free speech protections. The preliminary injunction prohibiting General Paxton from "issuing any guidance, pronouncements, threats of criminal prosecution or orders" itself threatens his personal right to comment on matters of public concern. The Texas Attorney General enjoys no less robust a right to participate in the marketplace of ideas than does anyone else, including the plaintiffs. *See, e.g., Bond v. Floyd*, 385 U.S. 116, 133–35 (1966).

IV.

As to "whether the [stay] applicant[s] will be irreparably injured absent a stay," *Nken*, 556 U.S. at 426, the state officials have easily met their burden. "When the State is seeking to stay a preliminary injunction, it's generally enough to say [that] any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Valentine*, 956 F.3d at 803 (quotation marks and brackets omitted). The Texas legislature has articulated criteria for vote-by-mail eligibility, *see* TEX. ELEC. CODE §§ 82.001–82.004, 82.007, which the Texas Supreme Court has held not to include a mere lack of immunity to the Virus, *In re State*, 2020 Tex. LEXIS 452, at *2. "The district court's injunction prevents the State from effectuating the Legislature's choice and hence imposes irreparable injury." *Valentine*, 956 F.3d at 803.

The subject and timing of the injunction render that injury particularly acute.

> [U]nder our Constitution[,] . . . the States are given the initial task of determining the qualifications of voters who will elect members

31

No. 20-50407

of Congress. . . . Moreover, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections . . . .

*Storer v. Brown*, 415 U.S. 724, 729–30 (1974) (citing U.S. CONST. art. I, §§ 2, 4).

This injunction strikes at the core of Texas's regulation of voting. It effectively requires that all voters be allowed to vote by mail, immediately and fundamentally affecting primary runoffs for which in-person voting begins in a matter of weeks. Perhaps, as the district court suggested, all "[c]itizens should have the option to" vote by mail as a matter of public policy, maybe they shouldn't. But an order *requiring* Texas to institute such a policy against its will presents significant, irreparable harm, which is precisely why the Supreme "Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). "That is especially true where, as here, . . . local officials are actively shaping their response to changing facts on the ground." *S. Bay*, 2020 U.S. LEXIS 3041, at *3 (Roberts, C.J., concurring).

V.

We consider "whether issuance of the stay will substantially injure the other parties interested in the proceeding," *i.e.*, the plaintiffs. *Nken*, 556 U.S. at 426.

It will not. "There is no doubt that [the Virus] poses risks of harm to all Americans, including" Texas voters. *Valentine*, 956 F.3d at 804. But our decision is limited to determining irreparable harm *not* in denying the plaintiffs'

32

No. 20-50407

requested relief outright but in temporarily staying the injunction pending a full appeal. Given the great likelihood that the state officials will ultimately succeed on the merits, combined with the undeniable, irreparable harm that the injunction would inflict on them—factors that we consider "the most critical," *id.* at 801—we hold that the balance of harms weighs in favor of the state officials.

## VI.

We have no trouble concluding that staying the injunction is "where the public interest lies." *Nken*, 556 U.S. at 426. The district court relied solely on a Ninth Circuit case for the proposition that "it is in the public interest not [*sic*] to prevent the State from violating the requirements of federal law." But "[b]ecause the State is the appealing party, its interest and [aforementioned] harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). And even so, "[a] temporary stay here, while the court can consider argument on the merits, will minimize confusion among both voters and trained election officials"—a goal patently within the public interest given the "extremely fast-approaching election date." *Id.*

Just days after themselves obtaining an injunction intervening in forthcoming elections, the plaintiffs ambitiously suggest that *we* should now refrain from intervening ourselves, given "the proximity of a forthcoming election and the mechanics and complexities of state election laws."[49] That invocation "reminds us of the legal definition of chutzpah: . . . a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan."[50] In any case, we "would prefer not to [intervene], but when a lower

---

[49] *Veasey v. Perry*, 769 F.3d 890, 893 (5th Cir. 2014) (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)).

[50] *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 n.5 (D.C. Cir. 1991); *see*

No. 20-50407

court"—at the plaintiffs' behest—erroneously "intervenes and alters the election rules so close to the election date, our precedents indicate that [we], as appropriate, should correct that error." *Republican Nat'l Comm.*, 140 S. Ct. at 1207.

\*     \*     \*     \*     \*

The state officials' motion to stay the preliminary injunction pending appeal is GRANTED. The injunction, in all its particulars, is STAYED pending further order of this court.

---

*also Marks v. Comm'r*, 947 F.2d 983, 986 (D.C. Cir. 1991) (per curiam) (applying the "chutzpah doctrine" to "fugitives from criminal prosecution" who "turn[ed] around and blame[d] the Commissioner for not finding them" (quotation marks omitted)).

No. 20-50407

JAMES C. HO, Circuit Judge, concurring:

These are difficult times. Many have suffered enormous loss. Many worry about what is coming next. To lose the ability to vote in an upcoming election due to fear of the pandemic would be beyond heartbreaking for citizens who are already hurting, for it is "a right they will *never* be able to recover." *Stringer v. Whitley*, 942 F.3d 725, 726 (5th Cir. 2019) (Ho, J., concurring).

State officials have responded by adopting various measures to ensure safety at the polls. If Plaintiffs believe these measures will not be enough, and that only mail-in ballots will suffice, that is understandable. But it is beyond our purview. Under the Constitution, it is a policy decision for the Texas Legislature to make. *See* U.S. CONST. art. I, § 4; *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809 (1969) (same).

We do not suspend the Constitution during a pandemic. That includes our constitutional structure of government. "Just as other government officials must not exceed their rightful power in extraordinary circumstances, this Court also must not do so"—lest "we abandon the Constitution at the moment we need it most." *In re Salon a La Mode*, __ S.W.3d __, __ (Tex. 2020) (Blacklock, J., concurring). Even—indeed, especially—in times of strife, fidelity to our Constitution must endure and guide us through the crisis.

I agree that we should grant a stay of the preliminary injunction pending appeal and thus join Judge Smith's powerful opinion for the court.

## I.

The right to vote is fundamental to our constitutional democracy. But it means nothing if your vote doesn't count. And it won't count if it's cancelled by a fraudulent vote—as the Supreme Court has made clear in case after case.

"Every voter's vote is entitled to be counted"—and that means every vote must be "protected from the diluting effect of illegal ballots." *Gray v. Sanders*, 372 U.S. 368, 380 (1963). "[P]rotection of the integrity of the ballot box is surely

35

a legitimate state concern." *O'Brien v. Skinner*, 414 U.S. 524, 534 (1974) (Marshall, J., concurring). There should be "no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.).

As Justice Stevens noted, "the risk of voter fraud" is "real." *Id.* And "it could affect the outcome of a close election." *Id.* "[F]lagrant examples of such fraud . . . have been documented throughout this Nation's history by respected historians and journalists." *Id.* at 195 (collecting examples).[1]

What's more, courts have repeatedly found that mail-in ballots are particularly susceptible to fraud. In *Crawford*, the plurality noted "Indiana's own experience with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor"—a fraud "perpetrated using absentee ballots." *Id.* at 195. And it observed that "much of the fraud" that has occurred in various elections nationwide "was actually absentee ballot fraud or voter registration fraud." *Id.* at 195 n.12. It cited an amicus brief that found "extensive problems with absentee ballot fraud" in various elections—including a 1997 Miami election that "was overturned on the basis of absentee ballot fraud." Brief of Amici Curiae The Brennan Center for Justice et al., at 12. Where voter fraud has been detected, "it generally takes the form of organized fraud," including "use

---

[1] Moreover, separate and apart from combating voter fraud, states have another reason to adopt anti-fraud measures—to maximize public confidence. "[P]ublic confidence in the integrity of the electoral process has *independent significance*, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197 (plurality op. of Stevens, J.) (emphasis added). As the Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, observed, "the 'electoral system *cannot inspire public confidence* if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'" *Id.* (emphasis added).

No. 20-50407

of fraudulent absentee or mail-in ballots." *Id.* at 19. *See also id.* at 21 (noting "thousands of incidents of possible absentee ballot fraud").[2]

Numerous members of our court have likewise concluded that "mail-in ballot fraud is a significant threat"—so much so that "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting." *Veasey v. Abbott*, 830 F.3d 216, 239, 256 (5th Cir. 2016) (en banc). *See also id.* at 263 ("[M]ail-in voting . . . is far more vulnerable to fraud."); *id.* (recognizing "the far more prevalent issue of fraudulent absentee ballots").[3]

There is no suggestion that these widely held concerns about voter fraud will not be present during the pandemic. So if there is to be expansion of mail-in voting notwithstanding these findings, our Constitution and precedents remind us that it must be done by legislators, not judges.

## II.

For nearly a century, mail-in voting has been the exception—and in-person voting the rule—in Texas. Under Texas law, only certain groups—

---

[2] Similarly, Justice Souter observed that mail-in voting is "less reliable" than in-person voting. *See Crawford*, 553 U.S. at 212 n.4 (Souter, J., dissenting) ("'election officials routinely reject absentee ballots on suspicion of forgery'"); *id.* at 225 ("absentee-ballot fraud . . . is a documented problem in Indiana").

[3] Another judge in our circuit who closely studied efforts to combat voter fraud likewise acknowledged the "general agreement that voting fraud exists with respect to mail-in ballots." *Veasey v. Perry*, 71 F. Supp. 3d 627, 653 (S.D. Tex. 2014). In fact, "there appears to be agreement that voter fraud actually takes place *in abundance* in connection with absentee balloting." *Id.* at 641 (emphasis added). "[T]here was universal agreement that a much greater risk of fraud occurs in absentee balloting, where some campaign workers are known to harvest mail-in ballots through several different methods, including raiding mailboxes." *Id.* at 676. Put simply: "Mail-in ballots are not secure." *Id.*

Moreover, mail-in voting not only "has an increased incidence of fraud" but also "a lower level of public confidence"—echoing the discussion of the importance of public confidence in *Crawford*. *Id.* at 677. There is "substantial testimony" that voters are "highly distrustful of the mail-in ballot system." *Id.* at 676. *See, e.g., id.* at 641 (citing testimony from voters who "do not trust that their vote will be properly counted if they have to vote by absentee ballot"); *id.* at 677 (citing testimony from voters that "expressed . . . distrust of voting by mail" because "'mail ballots have a tendency to disappear'").

No. 20-50407

including the disabled, the elderly, certain persons confined in jail, and voters who will be absent from the jurisdiction during the voting period—may vote by mail.  *See* TEX. ELEC. CODE §§ 82.001–82.004, 82.007.

Plaintiffs claim that Texas law is unconstitutional.  They offer two theories for why judges, rather than legislators, should expand mail-in voting: (1) voters fear going to public polling places due to the pandemic, and (2) Texas law discriminates on the basis of age.  I address each theory in turn.

**A.**

First, Plaintiffs contend that, due to the pandemic, voters fear going to public polling places.  Their concerns are very real, and very well taken.

But under governing Supreme Court precedent, expanding access to mail-in voting to redress personal hardship—as opposed to state action, *O'Brien*, 414 U.S. at 525–27, 529–31—is a policy matter for the Legislature, not the courts.  *See*, *e.g.*, *McDonald*, 394 U.S. at 809; *see also* U.S. CONST. art. I, § 4 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof.").

In *McDonald*, a group of eligible voters in county jail could not go to the polls, either "because they are charged with nonbailable offenses" or "because they have been unable to post the bail imposed by the courts."  394 U.S. at 803.  Nor did they qualify for mail-in ballots under state law.  So they sued under the Equal Protection Clause.  But the Court rejected their claim.  And that decision likely forecloses the equal protection claim presented here as well.

As the Court explained, absentee voting is "designed to make voting more available to some groups who cannot easily get to the polls."  *Id.* at 807.  So such laws increase options—not restrictions.  They "do not *themselves* deny [voters] the exercise of the franchise."  *Id.* at 807–08 (emphasis added).

38

Of course, there will always be other voters for whom, through no fault of the state, getting to the polls is "difficult" or even "impossible." *Id.* at 810. *See also id.* at 810 n.8 (collecting examples). But as the Court explains, that is a matter of personal hardship, not state action. For courts to intervene, a voter must show that *the state* "has in fact precluded [voters] from voting"—that the voter has been "prohibited from voting by the State." *Id.* at 808 & n.7.

The plaintiffs in *McDonald* failed to make this showing. As the Court observed, "the record is barren of any indication that the State might not, for instance, furnish the jails with special polling booths or facilities on election day, or provide guarded transportation to the polls themselves for certain inmates, or entertain motions for temporary reductions in bail to allow some inmates to get to the polls on their own." *Id.* at 808 n.6. *Cf. O'Brien*, 414 U.S. at 529–31 (noting failure to provide alternative measures stated in *McDonald*).

The record here is, if anything, even stronger for the state than in *McDonald*. There is affirmative evidence here that officials are taking various steps to ensure safety at the polls—measures familiar to anyone who has recently visited a grocery store. According to a sworn declaration, they include:

- "training election workers on best practices for setting up polling locations for social distancing, including determining maximum capacity inside the voting areas,"

- "[p]roviding a table-mounted Plexiglas protective shield at each voter check-in station,"

- "[p]roviding protective masks for all election workers,"

- "[p]roviding sanitizing wipes and hand sanitizer to each location in sufficient quantities as to accommodate voter turnout and equipment sanitation needs,"

- "[p]roviding social distancing floor decals to polling places to ensure safety recommendations are practiced inside and outside the location,"

No. 20-50407

- "[o]ffering cotton swabs to voters to use as a disposable stylus for marking their ballot selections on the touch screen ballot marking device,"

- "[p]lacing additional election workers in polling places to assist with changes relating to . . . the safety measures," and

- "[p]reparing for increased curbside voting traffic at polling places."

In sum, election officials "are working in earnest to ensure adherence to social distancing, limits on the number of people in one place, and constant sanitation of facilities." *In re State of Texas*, __ S.W.3d __, __ (Tex. 2020).

So this is not a case of official intransigence, as in *O'Brien*, 414 U.S. at 525–27. Tellingly, neither Plaintiffs nor the district court even mention *O'Brien*, and they invoke *McDonald* only in passing. They instead focus their attention on the Twenty-Sixth Amendment—a claim to which I will now turn.[4]

**B.**

Plaintiffs contend that, separate and apart from the pandemic, the Texas absentee ballot law expressly discriminates on the basis of age, because it permits all persons over the age of 65 to vote by mail, but does not provide that same automatic right to those under 65.

The Twenty-Sixth Amendment forbids discrimination in voting "on account of age." Similarly, the Fifteenth Amendment forbids discrimination in voting "on account of race." The text of the Fifteenth Amendment closely tracks the text of the Twenty-Sixth Amendment. And it would presumably run afoul

---

[4] Plaintiffs suggest that *McDonald* is an old decision that "predates most of the Supreme Court's modern voting rights jurisprudence." The suggestion seems uncharitable to the respected Justices who decided *McDonald*. *See*, *e.g.*, *O'Brien*, 414 U.S. at 531–33 (Marshall, J., concurring) (applying *McDonald*, which he joined). Courts continue to treat *McDonald* as the law of the land. *See*, *e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992) (citing *McDonald*); *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992) (same); *Martinez v. Mukasey*, 519 F.3d 532, 545 (5th Cir. 2008) (same).

of the Constitution to allow only voters of a particular race to vote by mail.  *See McDonald*, 394 U.S. at 807 (offering vote-by-mail on the basis of race would trigger "more exacting judicial scrutiny").

Plaintiffs do not mention the Fifteenth Amendment here, however.  Nor do any of the amici.  Moreover, the majority opinion correctly observes that the Supreme Court has said little to date about the Twenty-Sixth Amendment, and that the closest analogy available under current precedent is the *McDonald* approach to the Fourteenth Amendment.  That is surely right.  I would simply add that, even if one were to assume that Texas law violates the Twenty-Sixth Amendment, the preliminary injunction is likely flawed for another reason.

The Supreme Court has repeatedly held that "there are 'two remedial alternatives' . . . when a statute benefits one class . . . and excludes another from the benefit."  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017).  The remedy must provide equal treatment, of course.  But equal treatment can be achieved either by "withdrawal of benefits from the favored class" or by "extension of benefits to the excluded class."  *Id.*  "How equality is accomplished . . . is a matter on which the Constitution is silent."  *Id.* (quotations omitted).

So how do courts decide which remedy to order?  Do we "level up" (everyone gets to vote by mail) or "level down" (no one gets to)?  To decide, courts must determine "what the legislature would have willed had it been apprised of the constitutional infirmity."  *Id.* at 1699 (quotations omitted).  We look to "the legislature's intent, as revealed by the statute at hand."  *Id.*  If "the discriminatory exception consists of *favorable* treatment for a discrete group," we "strik[e] the discriminatory exception" and "extend[] the general rule . . . to cover the previously favored group."  *Id.*

These principles readily apply here.  Under Texas law, in-person voting is the rule, and mail-in voting is the exception.  And that is consistent with the

judicial consensus that "fraud is much greater in the mail-in ballot context than with in-person voting." *Veasey*, 830 F.3d at 239 (en banc).

So if Plaintiffs are entitled to relief, it is presumably the "leveling-down" injunction noted by Texas—an injunction "requiring all to vote in person," not one "extend[ing] mail-in voting to those under 65." As then-Judge Ginsburg once put it: "[W]hich would the political branches choose? It would take a court bolder than this one to predict . . . that extension, not invalidation, would be the probable choice." *Olsen v. DEA*, 878 F.2d 1458, 1464 (D.C. Cir. 1989).

If Plaintiffs have a legal theory to justify a "leveling-up" injunction, they did not offer one here. Nor did the district court. So a stay is warranted.[5]

\* \* \*

Our charge here is simple. As the majority opinion points out, and the Supreme Court recently reaffirmed: "[W]hen a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error." *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020). The district court demonstrably erred here, and in more ways than one—as the majority opinion extensively documents. Most notably, the district court ignored virtually the entire body of governing Supreme Court precedent relevant to this case, including *McDonald*, *O'Brien*, and *Morales-Santana*. So the state is likely to prevail in this appeal. I concur.

---

[5] Surely Plaintiffs do not *want* a "leveling-down" injunction—after all, depriving the elderly of mail-in voting would seem antithetical to the spirit of their lawsuit. But it may be the only relief courts are authorized to provide, in the event Plaintiffs ultimately prevail on the merits of their claim. *Compare, e.g.*, *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020) ("[B]y affording relief that the plaintiffs themselves did not ask for in their preliminary injunction motions, the District Court . . . erred."), *with Morales-Santana*, 137 S. Ct. at 1701 n.29 ("That Morales-Santana did not seek this outcome does not restrain the Court's judgment. The issue turns on what the legislature would have willed."). The parties have not briefed this issue, so I express no opinion here.

No. 20-50407

GREGG COSTA, Circuit Judge, concurring in the judgment:

This was a textbook case for *Pullman* abstention. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). The district court ruled just one day before the Supreme Court of Texas was hearing argument on a mandamus petition asking what counts as a "disability" under the mail-in ballot law. That forthcoming interpretation of state law could have made any federal constitutional ruling "unnecessary." *Id.* at 500.

All the hallmarks for *Pullman* abstention were present. The definition of disability was an "unsettled question[] of state law." 17A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4242 (3d ed. 2020). The answer to that question could have obviated the need for a federal constitutional ruling. *Id.* There was "already pending a state court action that [was] likely to resolve the state questions without the delay of having to commence proceedings in state court." *Id.* That parallel state case had already reached the state's highest court, which could provide a definitive answer on the meaning of state law. *See id.* (noting that abstention is more appropriate when there is a direct route to obtaining an answer from the state's highest court rather than having to "litigate[] through the entire state hierarchy of courts"). And with the state court's expediting its case, there would still be time for the federal court to rule if it needed to after the state court decision.

Plaintiffs' main push back against all of this is to argue that *Pullman* does not apply to voting rights cases. But we have applied *Pullman* to First and Fourteenth Amendment challenges in the related context of election disputes. *See Moore v. Hosemann,* 591 F.3d 741, 742–43, 745–46 (5th Cir. 2009) (abstaining because an "election dispute[] . . . based on an interpretation of uncertain state law . . . should be resolved at the state level before [the Fifth

Circuit] consider[s] wading into a constitutional thicket"). And the Supreme Court has rejected a civil rights exception for this abstention doctrine. *Harrison v. NAACP*, 360 U.S. 167, 169, 176–78 (1959); *see also* 17A WRIGHT & MILLER § 4242 (explaining that while language in "later" Supreme Court opinions "lends some support to the notion that there should not be abstention in civil rights cases, . . . it is clear that there is no rule to this effect"). The best refutation of a categorical civil rights exception is the very case that gave rise to the abstention doctrine—*Pullman* was an equal protection challenge to a Texas Railroad Commission order preventing African-American porters from working on sleeping cars. 312 U.S. at 497–98.

Although there is no full civil rights carve out for *Pullman* abstention, the importance of the constitutional right asserted can counsel against abstention. *See* 17A WRIGHT & MILLER § 4242 n.41 (citing First Amendment cases that highlight this principle). And the importance of that right may become decisive in the abstention analysis when there is a chance that waiting for a state court pronouncement will deprive the federal court of an opportunity to vindicate it. But that is why the timing of the parallel litigation made this such a strong case for abstaining. The Supreme Court of Texas was hearing its case on an expedited basis. That made it very likely the state court would rule in time for the federal court to then consider any remaining constitutional questions.

Indeed, it took the state court just a week to rule, so we now have the benefit of its decision. *See In re State of Texas*, No. 20-0394, 2020 Tex. LEXIS 452 (Tex. May 27, 2020). Its ruling may not have eliminated the federal constitutional claims, but it still shows the wisdom of waiting for an imminent interpretation of a state law before determining whether that law offends the Constitution. Although the Supreme Court of Texas held that "a lack of

[COVID] immunity alone" does not qualify as a disability, it also stated that "a voter can take into consideration aspects of his health and his health history that are physical conditions in deciding whether, under the circumstances, to apply to vote by mail because of disability." *Id.* at *26. In denying mandamus, the decision also explained that a voter need not "declare the nature of the underlying disability" and that Texas law "place[s] in the hands of the voter the determination of whether in-person voting will cause a likelihood of injury due to a physical condition." *Id.* at *28–29. The court further concluded that county clerks and election administrators "do not have a ministerial duty, reviewable by mandamus, to look beyond the application to vote by mail." *Id.* at *29.

These clarifications of Texas law may warrant the withdrawal of some claims or perhaps the additions of others. At a minimum, *In re Texas* changes the complexion of the federal litigation, especially the aspects of this case focused on the statements of state, county, and party officials about mail-in voting. For example, wouldn't it now be accurate for county clerks or campaign officials to tell voters that they get to determine "whether in-person voting will cause a likelihood of injury due to a physical condition"? *Id.*

A stay is thus warranted because the district court should have waited for the state supreme court ruling and should now evaluate the federal claims against that definite interpretation of state law. Maybe its result will be the same; maybe it won't. But this important issue should be resolved based on a full and accurate understanding of the relevant state law.

We should end this administrative stay decision with that threshold procedural error. But despite recognizing that the district court should have abstained, *see* Maj. Op. at 9 n.13, the majority goes on to address other procedural issues and the merits. In doing so, it makes the same mistake the

45

district court did: reaching "unnecessary" constitutional questions. *Pullman*, 312 U.S. at 500.

In addition to its perhaps more obvious interest in promoting "harmonious relation[s] between state and federal authority," *Pullman*, 312 U.S. at 501; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 75 (1997), *Pullman* is an example of the broader principle that a federal court should address constitutional questions only when necessary. *Pullman*, 312 U.S. at 500; 17A WRIGHT & MILLER § 4242; *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 345–56 (1936) (Brandeis, J., concurring). Because an interpretation of state law might eliminate or at least impact the constitutional issue, a federal court that does not wait for an imminent state court ruling risks publishing an advisory opinion.

That same principle counsels against our delving into the merits of the case in this stay decision. "[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). Because the failure to abstain alone supports a stay, merits discussion at this stage is unnecessary. It is also premature before the district court considers the claims in light of the now-determined issue of state law. The need for restraint is greater still at the stay stage as an opinion is not binding on the panel that will handle the appeal of the injunction. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). What is good for the district court should be good for the appellate court.

\* \* \*

COVID-19 has touched every aspect of our society. That includes the workings of our government. For the first time in its history, the Supreme Court has heard remote oral arguments. For the first time ever, in the House

of Representatives members have voted remotely by proxy. So it is not surprising that citizens claim that they too should be able to vote remotely.

These plaintiffs are not challenging measures elected officials have taken to combat COVID-19. *But see* Maj. Op. at 2 (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). Instead they are asking whether constitutional and statutory protections for voting rights require measures to ensure access to the ballot that is the lifeblood of our democracy—in particular, the ability to cast ballots by mail as hundreds of thousands of Texans have done in recent elections without significant fraud concerns. *See, e.g.*, *Early Voting – November 4, 2016*, TEX. SEC'Y OF STATE, https://www.sos.texas.gov/elections/earlyvoting/2016/nov4.shtml (reporting 311,324 "cumulative by mail voters" for early voting in the 2016 general election). These important questions deserve to be answered in the first instance on a full understanding of state law followed by appellate review with the benefit of oral argument and panel deliberation. Fortunately, there is still time for that.